IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF NORTH CAROLINA

| | | |
|---|---|---|
| KDH DEFENSE SYSTEMS, INC., | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | 1:11-CV-843 |
| | ) | |
| EAGLE INDUSTRIES UNLIMITED, INC., | ) | |
| | ) | |
| | ) | |
| Defendant. | ) | |

**MEMORANDUM OPINION AND ORDER**

Catherine C. Eagles, District Judge.

After a four-day trial in January 2013, a jury found that defendant Eagle Industries Unlimited, Inc., breached a contract to buy large-sized bulletproof panel inserts from plaintiff KDH Defense Systems, Inc., for use in military vests and awarded damages to KDH. (Doc. 82.) This matter is before the court on Eagle's Motion for Judgment as a Matter of Law or, Alternatively, a New Trial. (Doc. 85.) Finding no error in its jury instructions or evidentiary rulings meriting a new trial and concluding that Eagle is not entitled to judgment as a matter of law on either of the two issues it identifies, the Court will deny the motion.

Viewed in the light most favorable to the plaintiff, the evidence showed that Eagle needed over 12,000 panel inserts in relatively short order to fulfill a military contract for bulletproof vests, that Eagle was having issues with its subcontractor for these inserts because the subcontractor's inserts failed important quality tests, and that Eagle would suffer a severe financial penalty if the vests were not delivered to the military on time. Eagle sent KDH a written request for a quote ("RFQ") on two different factual scenarios; the uncertainty related to

whether the military would refuse to accept all inserts made by the original subcontractor (Scenario Two) or just the ones from the failed lots (Scenario One). Scenario Two called for a total of 12,505 inserts of varying sizes, including 3884 large-size inserts. KDH responded with written quotes for the requested number of inserts in each scenario.

The parties negotiated and orally agreed on a reduced price. Over the next few weeks, KDH and Eagle had many oral and e-mail conversations about the purchase and sale of the panel inserts, none of which mentioned any changes to the numbers. KDH worked with Eagle to get military approval for the use of its inserts in the vests, and Eagle kept KDH informed of its discussions and negotiations with the military and its original subcontractor so that KDH could begin making the inserts immediately once the problems were resolved.

Eagle orally authorized KDH to begin production on Scenario One in late January and sent a purchase order shortly thereafter. The purchase order for Scenario One stated a bigger number of inserts than was on the RFQ, so KDH called Eagle about the number. Eagle confirmed to KDH that the bigger number was a mistake. KDH produced the smaller number, which was the same number that was in the original RFQ. There is no dispute about the Scenario One contract.

Two weeks later, the remaining issues with the military and the subcontractor were clarified, and Eagle orally told KDH to start manufacturing the inserts for Scenario Two. KDH began work immediately. A few days later KDH received a written purchase order from Eagle listing 1192 fewer large-size inserts than KDH had requested in the Scenario Two RFQ. As before, KDH called Eagle to point out the error. Eagle was slow to answer but eventually admitted it had made a mistake in the RFQ and no longer wanted the bigger number of large-size

2

inserts. By this time, KDH had already completed manufacture of the other sizes and had begun manufacture of the large inserts.

The jury found that Eagle and KDH entered into a contract for panel inserts that included the 1192 large-size units at issue, that the inserts were specially manufactured goods, the production of which substantially began before Eagle repudiated the contract, and that Eagle breached the contract. (Doc. 82 at 1-2.) It awarded KDH $112,268.76 in damages for the 548 inserts actually manufactured and no damages for the remaining 644 inserts that it did not manufacture. (*Id.* at 2-3.)

"A judgment as a matter of law is proper 'when, without weighing the credibility of the evidence, there can be but one reasonable conclusion as to the proper judgment.'" *PBM Prods., LLC v. Mead Johnson & Co.*, 639 F.3d 111, 120 (4th Cir. 2011) (quoting *Singer v. Dungan*, 45 F.3d 823, 826 (4th Cir. 1995)). A new trial should be ordered when the verdict "is against the clear weight of the evidence, is based on false evidence, or will result in a miscarriage of justice." *The Cincinnati Ins. Co. v. Dynamic Dev. Grp., LLC*, 336 F. Supp. 2d 552, 561 (M.D.N.C. 2004) (citing *Atlas Food Sys. & Serv., Inc. v. Crane Nat'l Vendors, Inc.*, 99 F.3d 587, 594 (4th Cir. 1996)), *aff'd*, 154 F. App'x 378 (4th Cir. 2005).

## I. "Specially Manufactured Goods" Exception to the Statute of Frauds

The jury found that there was an oral contract between KDH and Eagle which included the 1192 inserts at issue and that the contract was enforceable because it satisfied the "specially manufactured goods" exception to the statute of frauds. (Doc. 82 at 1.) That exception applies if the disputed goods

> are to be specially manufactured for the buyer and are not suitable for sale to others in the ordinary course of the seller's business and the seller, before notice of repudiation is received and under circumstances which reasonably indicate that

the goods are for the buyer, has made either a substantial beginning of their manufacture or commitments for their procurement.

N.C. Gen. Stat. § 25-2-201(3)(a). Several of the grounds on which Eagle moves for judgment as a matter of law or for a new trial concern the specially manufactured goods exception.

### A. Exclusion of Evidence of Specially Manufactured Fabric

Eagle contends that a new trial is required because the Court improperly excluded evidence that the fabric used to manufacture the inserts was not specially manufactured. However, the pertinent issue was not whether the fabric was a specially manufactured good but (1) whether the vest inserts were specially manufactured goods and (2) whether a combination of acquiring, spreading, and cutting the fabric constituted a substantial beginning of the special manufacture of the vests. KDH did not advance a theory that the vests were specially manufactured *because* the component fabric was specially manufactured, so the relevance, if any, of evidence showing that the fabric was not specially manufactured was substantially outweighed by its potential to confuse the jury. It was therefore appropriate to exclude the evidence pursuant to Federal Rule of Evidence 403.

### B. Jury Instruction on Repudiation

The Court instructed the jury that a "'repudiation' occurs when the buyer clearly informs the seller that it will not comply with the terms of the original agreement, or otherwise informs the seller it will not buy the disputed goods." (Doc. 80 at 10.) Eagle contends that a new trial is necessary because the reference to an "original agreement" incorrectly presupposes that at the time of repudiation the buyer acknowledged or understood that the seller was alleging the existence of an oral contract. (*See* Doc. 86 at 12.)

The "original agreement" referenced in the instruction is more naturally read not as an agreement that the buyer knew the seller was alleging, but as an agreement found to exist by the

4

jury before reaching this issue. Indeed, the jury could only reach this issue after finding that there was an oral contract between the parties. The question for the jury, then, as instructed by the Court, was whether Eagle clearly informed KDH that it would not comply with the terms of the original agreement *found to exist by the jury* or otherwise informed KDH it would not buy the inserts covered by the oral contract *found to exist by the jury.*

Moreover, there is nothing in the instruction requiring or assuming that the buyer knew the seller was alleging the existence of a contract. Pursuant to the instruction, the jury could find that Eagle repudiated an oral agreement by clearly informing KDH it would not do or buy something it was contractually obligated to do or buy, regardless of whether Eagle knew at the time that KDH believed there was a binding contract. Eagle has failed to identify an error in the instruction, much less one that establishes that the verdict will result in a miscarriage of justice.

### C. Jury Instruction on Substantial Beginning

The Court instructed the jury to decide whether KDH made a substantial beginning of "the manufacture of the entire order of inserts." (Doc. 80 at 10.) Eagle contends that a new trial is warranted because the partial production of an order cannot trigger the specially manufactured goods exception for the entire order. On Eagle's view, the Court should have limited its specially manufactured goods instruction to the 548 inserts actually produced and should have precluded damages for the 644 inserts that KDH never started making.

The cases in other jurisdictions go both ways on this issue, and there is no definitive case from the North Carolina courts. *Compare Zhejiang Rongyao Chem. Co. v. Pfizer Inc.*, No. 11-5744 (PGS), 2012 WL 4442725, at *5 (D.N.J. Sept. 21, 2012) (denying motion to dismiss after finding that plaintiff's spending millions of dollars designing, building, and supplying a plant to manufacture pharmaceutical product for defendant and getting necessary regulatory and

5

governmental approvals constituted a substantial beginning, even though it had not begun to physically produce the product), *and R.M. Schultz & Assocs., Inc. v. Nynex Computer Servs. Co.*, No. 93 C 386, 1994 WL 124884, at *7 (N.D. Ill. Apr. 11, 1994) (denying summary judgment for defendant after finding that plaintiff's production of twenty-three units of one type of electronics system and five units of another was sufficient to constitute a substantial beginning of an oral contract for 100 of the first type of system and five of the second), *and Perlmuter Printing Co. v. Strome, Inc.*, 436 F. Supp. 409, 414 (N.D. Ohio 1976) (holding that printing of 62 percent of alleged quantity of flyers ordered constituted a substantial beginning for the entire alleged quantity), *with Automated Cutting Techs., Inc. v. BJS N. Am. E, Inc.*, No. 5:10-CV-208-REW, 2012 WL 2872823, at *5 (E.D. Ky. July 12, 2012) (finding that completion during the first year of a five-year contract of 30 percent of an expressly stipulated initial quantity did not qualify as a substantial beginning as to goods to be manufactured in the second through fifth years of the contract), *and EMSG Sys. Div., Inc. v. Miltope Corp.*, No. 5:97-CV-493-BO(2), 1998 WL 1095078, at *4 (E.D.N.C. Oct. 19, 1998) (holding that the special manufacture of 1000 circuit-board sets did not remove from the statute of frauds any additional sets not manufactured), *and Epprecht v. IBM Corp.*, No. 82-2577, 1983 WL 160571, at *393 (E.D. Pa. May 25, 1983) (holding that production of 7000 specially manufactured parts removed those parts only from the statute of frauds, not 43,000 other parts at issue for which there was no evidence of any substantial beginning), *and Vision Sys., Inc. v. EMC Corp.*, No. 034305BLS, 2005 WL 705107, at *6 (Mass. Super. Feb. 28, 2005) (concluding that production of 1247 units removed those units from the statute of frauds, but that there was no substantial beginning and therefore no enforceable contract for 5653 units not manufactured); *see also Chambers Steel Engraving Corp. v. Tambrands, Inc.*, 895 F.2d 858, 860-61 (1st Cir. 1990) (affirming district court's holding that

manufacture of a prototype embossing machine did not constitute a substantial beginning of contract for manufacture of twenty to thirty machines).

At trial, the Court was of the view that the cases authorizing recovery on the contract as a whole are better reasoned. The Court remains so convinced. In addition, the evidence in this case particularly supports the instruction given by the Court. There was evidence that when Eagle orally told KDH to begin Scenario Two, it did not mention any change in the numbers needed and that it thereafter failed to clearly and promptly communicate with KDH over the changed number of large-size inserts. The jury could reasonably have concluded this delay in repudiation was caused by Eagle's desire to insure KDH made all the inserts Eagle urgently needed while at the same time attempting to avoid responsibility for the full number of large-size inserts it had originally ordered. If the jury accepted that view of the facts, which it apparently did, it would have been justified in finding that KDH had made a substantial beginning of the contract as a whole.

Even if the Court is wrong, however, the error is harmless because the jury awarded KDH damages only on the 548 inserts it actually produced. (*See* Doc. 82 at 2-3.) It is difficult to see why Eagle should get a new trial on the 644 inserts when the jury already ruled in its favor on that aspect of the case.

### D. Judgment as a Matter of Law on Substantial Beginning

Eagle further contends that it is entitled to judgment as a matter of law because KDH did not substantially begin manufacture of the inserts at issue before Eagle repudiated. On Eagle's view, because the Court found post-trial in an order concerning pre-trial interest that Eagle breached the contract on February 17, 2011, (Doc. 83 at 1), any repudiation necessarily occurred on February 17, which was before KDH did any work on the large-sized inserts.

7

First, when Eagle repudiated and when KDH substantially began manufacture of the inserts were matters of fact left for the jury, and the jury did not find specific dates on which Eagle breached or repudiated. (*See* Doc. 82.) The Court's finding on breach for pre-trial interest purposes is not the same question.

At any rate, Eagle is incorrect that repudiation and breach necessarily occurred at the same time. There was sufficient evidence for the jury to find that breach occurred on February 17, when Eagle attempted to unilaterally modify the terms of the contract by issuing a purchase order for 1192 fewer inserts than called for by the contract, and that repudiation occurred sometime thereafter, when Eagle finally clearly informed KDH that it did not need and would not buy those 1192 contracted-for inserts. Eagle had orally asked KDH to begin making the Scenario Two inserts and had not mentioned any possibility that the numbers would be different from those in the RFQ. Eagle had a history of making mistakes in numbers in purchase orders to KDH, *see supra* p. 2, and KDH had been given no reason to think that the number was anything different from the number in the RFQ, which the parties had been discussing for several weeks. Eagle's argument is therefore unavailing, and Eagle is not entitled to judgment as a matter of law.

## II. Judgment as a Matter of Law on Breach

Eagle also contends that it is entitled to judgment as a matter of law on the issue of breach by nonperformance. Specifically, Eagle contends that Eagle could not breach by nonperformance until and unless KDH delivered the inserts in question, which it has still not done.

Tender of delivery "is a condition to the buyer's duty to accept the goods" and "entitles the seller to acceptance of the goods and to payment according to the contract." N.C. Gen. Stat.

8

§ 25-2-507(1). The requirement of tender is not considered in a vacuum; as the comments note, it is to be read within the framework of the other sections which bear upon delivery and payment. N.C. Gen. Stat. § 25-2-507 cmt. 1. Tender does not necessarily require that the seller put the goods in the possession of the buyer, *Allied Semi-Conductors Int'l, Ltd. v. Pulsar Components Int'l, Inc.*, 907 F. Supp. 618, 624-25 (E.D.N.Y. 1995) (citing N.Y. U.C.C. Law §§ 2-503 cmt. 1, 2-507(1); *Hawkland Uniform Commercial Code Series* § 2-503:2); instead, it "contemplates an offer coupled with a present ability to fulfill all the conditions resting on the tendering party and must be followed by actual performance *if the other party shows himself ready to proceed*," N.C. Gen. Stat. § 25-2-503 cmt. 1 (emphasis added).

It is undisputed that KDH actually made the 548 panel inserts for which damages were awarded and that KDH told Eagle it had made the inserts. Eagle's subsequent efforts to ascertain whether the military could find a use for these inserts provide strong circumstantial evidence that Eagle knew KDH was ready and willing to deliver those inserts. The evidence at trial was clear that Eagle would have rejected the inserts had they been physically delivered. Thus, Eagle's argument would require KDH to engage in a futile formality; the obstacle to physical delivery of the inserts was Eagle's unwillingness to proceed with acceptance, not KDH's inability or unwillingness to deliver. The evidence was sufficient to establish that KDH satisfied the tender requirement for these inserts.

Eagle's argument is perhaps more compelling with regard to the 644 inserts KDH never manufactured. *See* 18 *Williston on Contracts* § 52:6 (4th ed.) ("There can be no tender of delivery where the goods to be sold do not yet exist, as where they are in the process of being manufactured, or are not available for the buyer to take possession of them." (footnote omitted)). However, the jury did not award KDH any damages for these unproduced inserts. Either the jury

9

found that Eagle breached the contract by nonperformance only with respect to the 548 inserts that KDH manufactured and more clearly tendered to Eagle, or the jury found that Eagle's breach with respect to the 644 unproduced inserts resulted in no damages. In either case, the jury's consideration of the issue as to the unfinished inserts did not result in a verdict against Eagle so there is no need to set aside the verdict.

### III. Evidence That Eagle Failed to Disclose the Error in Number

Finally, Eagle moves for a new trial on the basis that the Court should not have allowed KDH to present evidence and to argue that Eagle failed to disclose an error it made when requesting a quote from KDH for a greater number of inserts than it in fact needed. Whether any delay in notifying KDH of the discrepancy was inadvertent or intentional was relevant to whether Eagle believed there was a contract for the bigger quantity, which in turn is relevant to whether that contract actually existed—the central issue in the trial. Moreover, the evidence was also highly probative of the credibility of Eagle's witnesses and, as noted *supra*, to the question of when Eagle repudiated, its motive for delaying repudiation, and whether there had been a substantial beginning. The probative value of the evidence was not substantially outweighed by any potential for prejudice.

### IV. Conclusion

Under Eagle's view of the facts, KDH had no obligation to make the inserts up until the point that Eagle sent the written purchase order and KDH accepted it. Thus, under Eagle's view of the facts, KDH would have been within its rights to refuse to make any of the Scenario Two inserts—some 9500—when Eagle unilaterally reduced the number it wanted. A jury could have accepted this view. But it was also reasonable for the jury to find that there was an oral contract for specially manufactured goods. By the time Eagle sent a written purchase order, it had only a

couple months to get the inserts inspected, place the inserts in the vests, finish the sewing, package the vests, and ship them to the military. Had KDH decided not to accept the purchase order in view of the reduced numbers, Eagle would have been up a creek without a paddle and would likely have defaulted on its contract with the military.[1] The jury was on firm ground in its decision that there was a binding oral contract which Eagle breached, and its resolution of the factual dispute is entitled to respect.

It is therefore **ORDERED** that Defendant's Motion for Judgment as a Matter of Law or, Alternatively, a New Trial, (Doc. 85), is **DENIED**.

This the 18th day of June, 2013.

_____
UNITED STATES DISTRICT JUDGE

---

[1] One wonders what Eagle's position would have been about the existence of an oral contract if KDH had refused to make any of the Scenario Two inserts and had taken the position that Eagle took throughout this litigation. The jury would have been well within its rights to suspect that Eagle would have taken the opposite position from the one it took in this litigation, even though the material facts would have been the same.

11